(644 P.2d 1348)
No. 52,828

FRANK HENKEL, *Appellee,* v. JOHN W. JORDAN and DELORIS M. JORDAN, *Appellants.*

Petition for review denied June 29, 1982.

Opinion filed May 20, 1982.

*Christopher Randall,* of Turner and Boisseau, Chartered, of Wichita, for the appellants.

*Jack N. Turner,* of Hall, Turner & Pike, Chartered, of Wichita, for the appellee.

Before FOTH, C.J., REES and PARKS, JJ.

FOTH, C.J.: This is a "dog fright" as opposed to a "dog bite" case. The primary issue is whether defendants could properly be held liable for personal injuries suffered by plaintiff when, frightened by defendant's dog, he lost control of and fell from a bicycle. A jury returned a substantial verdict for plaintiff. Defendants appeal, contending first and foremost that liability could only arise if their dog was vicious and they knew it, and the dog bit or otherwise came into physical contact with plaintiff. There being no evidence or contention of any such contact, they maintain their motion for directed verdict should have been sustained.

Although many facts were hotly contested at trial, on appeal defendants do not challenge plaintiff's version. His evidence showed:

In June, 1977, defendants John and Deloris Jordan and their children lived in a single family house at 6613 East Tenth Street in Wichita. They were relative newcomers to the neighborhood, having moved in just over a year before. They brought with them their dog "Peanut." Peanut was a cockapoo, *i.e.,* part cocker spaniel and part poodle, and weighed at most twenty pounds. He was permitted to run loose at times and acquired a reputation in the neighborhood as a pest—he routinely barked at passersby, dashing at them in a way taken by many to be menacing. He was described by a neighbor in one encounter as "pawing at the

ground, showing [his] teeth, snarling." Two neighborhood women who has been accustomed to walking by the Jordan house told of frightening encounters with Peanut. Thereafter one of the women wouldn't go by without her husband. He, after one encounter where he had to beat Peanut off with a branch broken from a tree, took to carrying a cane to serve that function. Both women eventually chose alternative routes. Just three days before plaintiff's encounter, a young lady next door to the Jordans had rescued a tearful little girl from the street where Peanut had the child "cornered." Although he was never known to have bitten anyone, Peanut was by most accounts a menace and by all accounts a bouncy, pesky, yappy little dog.

Plaintiff Franklyn Henkel and his wife also lived on East Tenth Street, at 6510. At about 6:30 p.m. on June 22, 1977, the Henkels set out on their five-speed bicycles to visit a friend. Plaintiff, 62 years old at the time, had for many years served as coach and athletic director at a Wichita high school. He had undergone knee surgery the preceding fall, and the bicycle riding was part of his prescribed therapy. Although he knew of loose dogs in the neighborhood and disliked their running and barking at him while he was bicycling, he nevertheless elected to ride down East Tenth. (Defendants attempt to make much of this, as will be discussed later.)

As the Henkels went by the Jordan house, Peanut came running up, barking as was his wont. Plaintiff, who was in the lead, saw the dog out of the corner of his eye, close to his bike. He made an evasive turn, lost control, and was thrown over the handlebars. An ambulance took him to a hospital where he remained about three months recovering from a concussion, a broken clavicle, a broken hip, and assorted cuts and abrasions.

The jury assessed plaintiff's damages at $160,435.28, and found plaintiff 15% at fault. Defendants no longer challenge the amount of plaintiff's damages. On appeal their arguments are (1) the facts do not establish a prima facie case of liability, (2) the court should have instructed the jury on the doctrine of "assumption of risk," and (3) the comparative negligence instruction was misleading or confusing.

1. Defendants' liability argument is based on dog bite and other cases, where an animal has directly inflicted physical injury. *McKinney v. Cochran,* 197 Kan. 524, 419 P.2d 931 (1966);

*Berry v. Kegans,* 196 Kan. 388, 411 P.2d 707 (1966); *Gardner v. Koenig,* 188 Kan. 135, 360 P.2d 1107 (1961); *McComas v. Sanders,* 153 Kan. 253, 109 P.2d 482 (1941). Under such cases, they argue, the plaintiff had the burden of proving two essential elements: (1) that the dog had vicious propensities; and (2) that the owners had knowledge of these vicious characteristics.

We have no quarrel with those cases, or with defendants' thesis drawn from them. Liability in animal cases, as in all negligence cases, is based on the "fault" of the animal owner. If the animal is not vicious, or is not known to be vicious, its owner cannot reasonably be found blameworthy if the animal unexpectedly injures someone. Foreseeability of injury is an essential ingredient of negligence.

Here, however, we are dealing with physical injury directly resulting from fright, albeit induced by an animal. In assessing "fault" in such a case foreseeability is again the key. Physical contact is not necessary. Over 75 years ago our court noted:

"There is a conflict in the authorities in regard to whether there can be a recovery for physical injuries resulting from fright where the act causing the fright was merely negligent and not willful, and differences of opinion as to what constitutes a physical injury and whether certain injuries can be regarded as the proximate result of the negligence which caused the fright; but the great weight of authority is that if the bodily injury is the direct and reasonable consequence of the fright caused by the negligence a recovery may be had although the negligence may have been unintentional." *Whitsel v. Watts,* 98 Kan. 508, 510, 159 Pac. 401 (1916).

See also Annot, 64 A.L.R.2d 100; 98 A.L.R. 402.

Two "dog fright" cases from other jurisdictions have been brought to our attention. In *Farrior v. Payton,* 57 Hawaii 620, 562 P.2d 779 (1977), the plaintiffs were strolling along the beach. Because the tide came in, the plaintiffs were unable to continue along the shoreline so they climbed a natural rock wall in order to proceed further, unwittingly trespassing upon the defendants' property. Upon reaching the top of the rock wall the plaintiffs arrived in the back yard of the defendants. There, the defendants' German Shepherd dog ran toward the plaintiffs in a position one plaintiff recognized as an "attack" position. Evidence showed the dog was in the company of the defendants' son and that the dog would respond to his commands. Evidence also showed the defendants knew the dog would run and bark at strangers. The plaintiffs, in their efforts to escape the dog, fell off the rock wall

and were injured. The trial court granted the defendants a directed verdict at the close of evidence and the plaintiffs appealed.

The supreme court reversed and remanded for jury determination of the comparative negligence of the plaintiffs and defendants. The court noted that the defendants were aware of the dog's propensity to run and bark at strangers and that because of the proximity of the defendant's home to the shoreline strangers frequently trespassed inadvertently on the defendants' property. Although the defendants knew the dog would not bite anyone absent a command, strangers would be unaware that they were not in danger and would probably retreat from the dog to a precarious position on the rock wall. The court decided that reasonable persons could reach different conclusions concerning liability in the case and thus a directed verdict was improper.

In *Machacado v. City of N.Y.,* 80 Misc. 2d 889, 365 N.Y.S.2d 974 (1975), the plaintiff was strolling along a public sidewalk in front of the defendant's house. The defendant had a chain link fence surrounding the house which prevented the defendant's dog from venturing forth along the public way. The defendant's dog, upon seeing the plaintiff, charged "furiously . . . [and] hurled itself at the fence, snarling and barking angrily at the plaintiff." Taken aback and frightened by this sudden, hostile activity, the plaintiff made a sudden move to escape which resulted in injury.

The dog owner sought dismissal of the complaint for failure to state a cause of action. The court denied the motion. It noted the novel fact situation but ruled that the same general legal principles apply in "dog fright" cases as in "dog bite" cases. The owners must have knowledge of the dog's propensity which foreseeably would endanger another person, and the absence of physical contact between the dog and the plaintiffs was of no moment. The court analogized to other negligence cases where the defendant could reasonably foresee that a person would be injured by the negligent act without actual contact, citing Restatement of Torts § 436 (1934). See also Restatement (Second) of Torts § 303 (1965). The petition therefore stated a cause of action, and whether the facts amounted to negligence was a jury question.

Here, Peanut was known to run toward people, snarling and

growling, though he had never bitten anyone. The defendants were put on notice by numerous individuals that the dog had frightened people who passed along the street. In their brief defendants review the testimony on notice and, attempting to minimize their knowledge, conclude: "Taken together, this evidence might prove that the Jordans knew their dog had a menacing behavior toward people walking near their yard." Although such knowledge might be insufficient to impose liability for a bite, in this case it was Peanut's "menacing behavior" which caused the injury. Defendants were concededly aware of *this* propensity of their dog. Whether they should have forseen that it would cause injury and have taken steps to prevent such injury were fact questions, properly submitted to the jury.

2.   Defendants' "assumption of risk" theory was based on plaintiff's knowledge that there were dogs in Peanut's neighborhood and election to ride through it anyway. The requested instruction relied on for this argument was:

"A person can be found negligent where he knows or should know of a danger and he voluntarily exposes himself to that danger."

Instead the court gave the following:

"Negligence is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something that an ordinary person would not do, measured by all the circumstances then existing. It is also referred to as the failure to exercise due care.

"You are instructed that the plaintiff had the duty to exercise due care for his own safety."

Even if we assume it can be negligence to make lawful use of a public street, the instruction given covered the concept of the requested instruction; it gave defendants plenty of room to argue their theory of negligence, and they in fact did so. It was a general instruction in accordance with the guidelines of *Bechard v. Concrete Mix & Construction Inc.,* 218 Kan. 597, 600-01, 545 P.2d 334 (1976). There was no error in refusing the request.

3.   Finally, defendants argue that the instructions, and particularly No. 6, required the jury to compare plaintiff's "fault" to that of Peanut. A dog, they observe, cannot be at "fault."

We note first that there was no objection on this ground to instruction No. 6 during the usual colloquy on requests and objections. The only objection made was based on defendants' theory that a bite or other contact were necessary—a theory

discussed and rejected under point 1. above. Only after the jury had been instructed, arguments had been made, and the jury had retired to deliberate did defense counsel evidence the present concern. We conclude from this that the claimed misleading nature of the instruction was not readily apparent, even to counsel.

The instruction complained of says:
"No. 6

"Portions of this case must be determined on the basis of *comparative causal responsibilities* of the dog 'Peanut' and Frank Henkel.

"*Causal responsibility refers to those actions which caused Mr. Henkel to fall from his bicycle.*

"Your obligation in this regard is to assign a percentage of *fault to each of the parties.* A party is at fault in this case when what he or it did caused or contributed to the event which brought about the injury or damages for which claim is made.

"This percentage figure may range from zero percent to one hundred percent. When all the percentages of fault are added together, the total must equal one hundred percent.

"You have the discretion to assign *fault* to Franklyn Henkel *and to the dog 'Peanut.'*

"The laws of Kansas applicable to this case require me to reduce the amount of damages you have awarded by the percentage of fault that you find is attributable to that party.

"A party will be entitled to recover damages if his fault is less than 50% of the total fault. A party will not be entitled to recover damages, however, if his fault is 50% or more." Emphasis added.

Although the instruction does use the term "fault" in describing the jury's apportionment function, it also speaks of "causal responsibility" and, to our minds, uses the terms interchangeably. It is necessary, of course, to consider No. 6 in context, including:

"No. 3

"In this case, if you find from all the evidence that the Plaintiff has proved each of the following statements to be more probably true than not true, then you will find for the plaintiff, determine the percentage of fault, and determine the plaintiff's damages.

"1.  That one or both of the Defendants owned the dog named 'Peanut';

"2.  That 'Peanut' was the dog involved in this incident;

"3.  That if he was allowed to run loose, 'Peanut' was likely to cause substan-

tial harm to others;

"4. That the defendants or either of them knew or had reason to know that 'Peanut' was likely to cause substantial harm to others;

"5. That 'Peanut' caused substantial harm to the plaintiff;

"6. That the substantial harm was caused in a manner foreseeable by the defendant;

"7. That the actions of 'Peanut' were at least 51% responsible for the plaintiff's injuries.

"If you find that the plaintiff has not met his burden of proof on each and every one of the foregoing statements, you will find for the defendant.

"No. 4

"Dogs have from time immemorial been regarded as friends and companions of man. The great majority of dogs are harmless, and dogs have been traditionally regarded as unlikely to do substantial harm if allowed to run at large, so that their keepers are not required to keep them under constant control. If, however, the owner of a dog knows or has reason to know that if a dog is not kept under constant control it is likely to cause substantial harm to others, the owner has a duty to keep his dog confined."

The true fault to be compared was plaintiff's in selecting his route and controlling his bicycle with defendants' in letting Peanut run loose. We think Nos. 3 and 4, together with 5 (defining negligence, quoted above) adequately conveyed that message. The jury was first to determine whether defendants knew Peanut on-the-loose was dangerous, and whether the harm resulting was of the type they should have foreseen if he was loose. Only then was it required to allocate causation. No. 6, while not perfectly drawn, put the jury to the task of allocating causal responsibility between the conduct of plaintiff and the conduct of the dog—for which defendants were 100% responsible.

Looking at the instructions as a whole we think they "properly and fairly state the law" and that "the jury could not reasonably be misled by them." *Bechard,* 218 Kan. at 601.

Affirmed.